305 F.3d 989
 Katsuko HOSAKA, individually and on behalf of the Estate and heirs of Sadao Hosaka, Plaintiff-Appellant,
v.
UNITED AIRLINES, INC.; UAL Corporation, Defendants-Appellees.
Takeo Yoshikawa; Kimiko Yoshikawa; Yae Yoshikawa; Ayako Yoshikawa; Yuki Yoshikawa; Miyoko Nakazato, Plaintiffs-Appellants,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Takehito Yoshikawa; Nami Yoshikawa; Sachiyo Yoshikawa, a minor, and Chizuru Yoshikawa, a minor by and through their guardian ad litem Takehito Yoshikawa, Plaintiffs-Appellants,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Nobuyuki Tanaka; Kinuyo Tanaka; Yukiko Tanaka; Makiko Tanaka, Plaintiffs-Appellants,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Koja Teshima; Kumiko Teshima, Plaintiffs-Appellants,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Kozo Yamada; Isa Yamada; Mashiko Yamada; Chizuru Yamada, Plaintiffs-Appellants,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Nobuaki Mizuno; Takako Mizuno, Plaintiffs-Appellants,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Takashi Onishi; Junko Onishi; Masaya Onishis; Mihiko Onishi, Plaintiffs-Appellants,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Yasuo Tanaka; Susumu Tanaka; Ayako Tanaka, Plaintiffs-Appellants,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Nubuo Shiga, Plaintiff-Appellant, and
Kimee Shiga, Plaintiff,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Izumi Tosaka, Plaintiff-Appellant,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Hatsumi Ito, Plaintiff-Appellant,
v.
United Airlines, Inc.; UAL Corporation, Defendants-Appellees.
Takamasa Kataura, Plaintiff-Appellant, and Machie Taira, Plaintiff,
v.
United Airlines, Inc.; Ual Corporation, Defendants-Appellees. Kaori Ito, Plaintiff-Appellant,
v.
United Airlines, Inc.; Ual Corporation, Defendants-Appellees. Shuichi Inako; Hisako Iako; Osamu Inako; Hiroshi Inako, a minor, by and through his guardian ad litem Shuichi Inako, Plaintiffs-Appellants,
v.
United Airlines, Inc.; Ual Corporation, Defendants-Appellees. Shuichiro Minami; Yuriko Minami; Takahiro Minami, a minor, by and through guardian ad litem Shuichiro Minami; Tomohiro Minami, a minor, by and through guardian ad litem Shuichiro Minami, Plaintiffs-Appellants,
v.
United Airlines, Inc.; Ual Corporation, Defendants-Appellees. Masaki Konuma, Plaintiff-Appellant,
v.
United Airlines, Inc.; Ual Corporation, Defendants-Appellees. Keiko Hirase, Plaintiff-Appellant,
v.
United Airlines, Inc.; Ual Corporation, Defendants-Appellees.
 No. 00-15223.
 No. 00-15224.
 No. 00-15225.
 No. 00-15226.
 No. 00-15228.
 No. 00-15229.
 No. 00-15230.
 No. 00-15231.
 No. 00-15238.
 No. 00-15239.
 No. 00-15241.
 No. 00-15242.
 No. 00-15243.
 No. 00-15244.
 No. 01-15120.
 No. 01-15123.
 No. 01-15124.
 No. 01-15131.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 12, 2002 — San Francisco, California.
 Filed September 18, 2002.
 
 Walter J. Pakter, Law Offices of Walter J. Pakter, Gerald C. Sterns, Sterns, Susie Injijian, Sterns & Walker; Tesfaye W. Tsadik, Law Offices of Tesfaye W. Tsadik, Oakland, CA, for the plaintiffs-appellants.
 Richard G. Grotch and Clinton H. Coddington, Coddington, Hicks & Danforth, Redwood City, CA, for the defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; Martin J. Jenkins, District Judge, Presiding. D.C. Nos. CV-99-02905-MJJ, CV-99-03710-MJJ, CV-99-03708-MJJ, CV-99-02939-MJJ, CV-99-02912-MJJ, CV-99-02911-MJJ, CV-99-03712-MJJ, CV-99-04219-MJJ, CV-99-02909-MJJ, CV-99-02908-MJJ, CV-99-02907-MJJ, CV-99-02906-MJJ, CV-98-04075-MJJ, CV-99-02210-MJJ, CV-99-05063-MJJ, CV-99-05062-MJJ, CV-99-05308-MJJ, CV-99-05061-MJJ.
 Before REINHARDT and FISHER, Circuit Judges, and MOLLOY, District Judge.*
 FISHER, Circuit Judge.
 
 
 1
 In these consolidated appeals, plaintiffs challenge the district court's dismissal of their actions on the ground of forum non conveniens. Plaintiffs brought claims under the Warsaw Convention arising out of injuries sustained when their United Airlines flight from Tokyo to Hawaii encountered turbulence over the Pacific Ocean. Applying the federal common law doctrine of forum non conveniens, the district court dismissed plaintiffs' actions in favor of a more convenient forum in Japan. Plaintiffs contend it was error for the district court to entertain United's motions for forum non conveniens because the Warsaw Convention, which establishes four forums in which an action arising under the treaty must be brought, precludes application of that doctrine here. We agree. We hold that Article 28(1) of the Warsaw Convention overrides the discretionary power of the federal courts to dismiss an action for forum non conveniens.[1] Accordingly, the judgments of the district court dismissing these actions on the ground of forum non conveniens are reversed.
 
 PROCEDURAL HISTORY
 
 2
 These related cases were brought by passengers on United Air Lines Flight 826, which was scheduled to fly from Tokyo, Japan to Honolulu, Hawaii on December 29, 1997. Flight 826 encountered severe turbulence over the Pacific Ocean, approximately three hours into the flight. The turbulence resulted in the death of one passenger and injuries to many others. Flight 826 then diverted course and returned to Tokyo. Several of the injured passengers, and in some cases family members who were not passengers on the flight, brought suit to recover damages under the Warsaw Convention, a multilateral treaty governing the international carriage of passengers, baggage and cargo by air drafted in 1929 and adhered to by the United States in 1934.
 
 
 3
 The district court granted United's two motions to dismiss for forum non conveniens.[2] The court held that Article 28(1) of the Warsaw Convention, which sets forth four forums in which an action must be brought and grants the plaintiff the option of choosing among these jurisdictions, did not act as a procedural bar to the court's entertainment of a motion to dismiss for forum non conveniens. Plaintiffs appealed. We have jurisdiction over these appeals under 28 U.S.C. § 1291 and we reverse.
 
 DISCUSSION
 I.
 
 4
 We review a district court's interpretation of treaties de novo. United States v. Idaho, 210 F.3d 1067, 1072(9th Cir.2000), aff'd, 533 U.S. 262, 121 S.Ct. 2135, 150 L.Ed.2d 326 (2001). Our interpretation of the Warsaw Convention begins with the text. El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 167, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). If the plain text is ambiguous, we look to other sources to elucidate the treaty's meaning, Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989), including the purposes of the treaty, its drafting history, the postratification understanding of the contracting parties and the decisions of the courts of other signatories. See Tseng, 525 U.S. at 167-76, 119 S.Ct. 662. Throughout, "it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." Air France v. Saks, 470 U.S. 392, 399, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). Here, although the text is ambiguous, the purposes, drafting history and treatment of the issue elsewhere compel us to conclude that forum non conveniens is not available in the Warsaw Convention actions giving rise to these appeals.
 
 A. Text
 
 5
 "Our inquiry begins with the text." Tseng, 525 U.S. at 167, 119 S.Ct. 662. The text of the Warsaw Convention is silent on the availability of the doctrine of forum non conveniens. Questions of jurisdiction and procedure, however, are governed by Article 28, which states:
 
 
 6
 (1) An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or of his principal place of business, or where he has a place of business through which the contract has been made, or before the court at the place of destination.
 
 
 7
 (2) Questions of procedure shall be governed by the law of the court to which the case is submitted.
 
 
 8
 Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3020-21, T.S. No. 876 (1934), note following 49 U.S.C. § 40105.[3]
 
 
 9
 This text is susceptible to two equally plausible interpretations, as the following two decisions illustrate.[4] In Milor v. British Airways, Plc., [1996] Q.B. 702, 706 (Eng.C.A.), the British Court of Appeal concluded that the text precluded the forum non conveniens doctrine, reasoning that the "[t]he procedural power to stay on the ground of forum non conveniens is ... inconsistent with the right conferred on the plaintiff to choose in which of the competent jurisdictions his action will be tried...."[5] Under this view of the text, the scope of the forum state's procedural law incorporated by Article 28(2) is subject to Article 28(1), which grants to the plaintiff an absolute right of choice as between four presumptively convenient jurisdictions.
 
 
 10
 Also plausible, however, is the textual interpretation adopted in In re Air Crash Off Long Island New York, on July 17, 1996, 65 F.Supp.2d 207, 214 (S.D.N.Y. 1999), in which the court reasoned that the text of Article 28(2) plainly incorporates the forum state's procedural law. Because forum non conveniens is a feature of United States procedural law, see Am. Dredging Co. v. Miller, 510 U.S. 443, 453, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994), "[f]orum non conveniens is a procedural tool available to U.S. courts and thus squarely falls within the literal language of Article 28(2)." In re Air Crash Off Long Island, 65 F.Supp.2d at 214; accord In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982, 821 F.2d 1147, 1161 (5th Cir.1987) (en banc) (holding that the Warsaw Convention permits application of forum non conveniens because the plaintiff's choice under Article 28(1) is "subject to the procedural requirements and devices that are part of that forum's internal laws"). It is axiomatic that an agreement "subject to two or more reasonable interpretations... is ambiguous." Gen. Accident Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd., 288 F.3d 651, 653 (5th Cir.2002).
 
 
 11
 In adopting its interpretation of Article 28, the Milor court also deemed it significant that the governing French text uses the word "portée" in Article 28(1), where it states that an action must be "brought" in one of the competent jurisdictions, while using the word "intentée" in Article 29, governing the timeliness of the lawsuit, where it states that an action must be "brought" within two years.[6] It is a sound principle of treaty construction that where the drafters used two different words it "implies that the drafters of the Convention understood the word[s] ... to mean something different..., for they otherwise logically would have used the same word in each article." Saks, 470 U.S. at 398, 105 S.Ct. 1338. Applying this principle, the British court reasoned that the use of "intentée" in Article 29 must convey a "narrow meaning" of brought, namely "initiated," whereas the use of "portée" in Article 28 must carry a broader meaning, namely "commenced and pursued." [1996] Q.B. at 707. The latter meaning, Milor reasoned, would foreclose a forum transfer.
 
 
 12
 Plaintiffs ask us to adopt the Milor court's textual analysis here, but we decline to do so. Although the use of two different words implies different meanings, we cannot ascertain why the use of portée requires that the action must be litigated to conclusion in the forum selected by the plaintiff. The dictionary meanings of the French terms do not compel this outcome.[7] Moreover, the recently signed, but not yet ratified, successor to the Warsaw Convention, the 1999 Montreal Convention, uses portée and intentée in a manner that undermines the Milor court's analysis. Article 33(1) of the Montreal Convention, which is designed to replace Article 28(1) of the Warsaw Convention, states that "[a]n action for damages must be brought, at the option of the plaintiff," in one of four jurisdictions, and uses the word portée, just like the 1929 original. Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on 28 May 1999, S. Treaty Doc. No. 106-45, art. 33; Convention Pour L'Unification de Certaines Régles Relatives au Transport Aéren International, art. 33, available at http://www.icao.int/ icaonet/dcs/9740.pdf (last visited Aug. 6, 2002).[8] The next paragraph, Article 33(2), states that "[i]n respect of damage resulting from the death or injury of a passenger, an action may be brought before one of the courts mentioned in paragraph 1 of this Article, or in the territory...." Id. The French text of this Article employs intentée rather than portée. The Montreal Convention's usage suggests that any difference in the meanings of these words is not dispositive. In sum, we conclude that the text of Article 28 is ambiguous.
 
 B. Purpose
 
 13
 Where the text of a treaty is ambiguous, we may look to the purposes of the treaty to aid our interpretation. See Tseng, 525 U.S. at 169-72, 119 S.Ct. 662. "The cardinal purpose of the Warsaw Convention... is to `achiev[e] uniformity of rules governing claims arising from international air transportation.'" Tseng, 525 U.S. at 169, 119 S.Ct. 662 (quoting Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 552, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991)) (second alteration in original). By including an article addressing jurisdiction, the signatories manifested their intent to create not just uniform rules of liability, but also uniform rules of jurisdiction.[9] As the British court concluded in Milor, through Article 28 the signatories "create[d] a self-contained code on jurisdiction" that "harmonise[s] different national views on jurisdiction." [1996] Q.B. at 707 (quoting lower court). Application of the doctrine of forum non conveniens would undermine the goal of uniformity. As the Milor court observed, "[t]hat harmony would inevitably be to some extent disturbed if by the use of the forum non conveniens doctrine a plaintiff would be denied the right in some countries to sue in one of the four forums nominated in article 28(1) of the Convention, but not denied that right in others." Id. (quoting lower court). It also would subject actions brought under the Convention to a doctrine that itself is "vague and discretionary," United States v. Nat'l City Lines, 334 U.S. 573, 581, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948), and that "is most unlikely to produce uniform results." Am. Dredging Co., 510 U.S. at 453, 114 S.Ct. 981.
 
 
 14
 The second purpose of the Convention is to balance the interests of air carriers against those of passengers. See Tseng, 525 U.S. at 170, 119 S.Ct. 662. Once again, the scope of this objective extends beyond rules governing liability to those concerning jurisdiction. By permitting the plaintiff to bring suit in four limited forums, but granting the plaintiff the option of choosing among those jurisdictions, the Convention likewise struck "a compromise between the interests of air carriers and their customers worldwide." Tseng, 525 U.S. at 170, 119 S.Ct. 662. "[W]hen giving the plaintiff an option as to which of the competent jurisdictions to choose as the forum, the high contracting parties were conferring a deliberate benefit on a plaintiff in circumstances where they had to weigh the interests of a customer of an airline on the one hand and the airline on the other." Milor, [1996] Q.B. at 709. Permitting defendants to utilize forum non conveniens to cancel out the plaintiff's choice would undermine this balance just as it would undermine uniformity. The doctrine of forum non conveniens is inconsistent with the Convention's dual purposes of uniformity and balance.
 
 C. Drafting History[10]
 
 15
 The drafting history also supports plaintiffs' position. During the 1929 conference, the British delegation proposed an amendment that would have expressly preserved a court's discretion to decline jurisdiction in an action brought under the Convention, as long as the procedural rules of the forum state permitted the exercise of such discretion. The British proposal would have added the following paragraph to what ultimately became Article 28:
 
 
 16
 None of the stipulations of this Article shall be deemed to bind any court whatsoever to hear a complaint which it would consider, according to the principles of law and procedure in force in the country to which the said court belongs, as contrary to the rules of justice, or as irrelevant to be submitted to it.
 
 
 17
 Minutes of the Second International Conference on Private Aeronautical Law 298-99 (Oct. 4-12, 1929) (R. Horner & D. Legrez trans., 1975) (hereinafter "Minutes").[11] The British argued that "[a] stipulation of this nature would avoid all interference in the discretionary power of the courts, and would give them more latitude to repress vexatious litigation, as in the case where the `forum' of another country would be naturally indicated as being that where the debates should take place." Id. at 299.[12] This proposal was referred to committee, but what happened within the committee is unclear. The official minutes of the Convention report only that:
 
 
 18
 There was a British proposal consisting in adding a paragraph to say that the courts had the right not to act when certain provisions could be contrary to rules of law of the country. The British Delegation did not insist.
 
 
 19
 Id. at 169.
 
 
 20
 This drafting history has been described as "inconclusive." In re Air Crash Off Long Island, 65 F.Supp.2d at 214. We do not know whether the amendment was considered and rejected by the delegates or if it merely was abandoned by the British. That said, the failed British amendment is not irrelevant. That the British delegation proposed an explicit incorporation of the doctrine of forum non conveniens strongly suggests that the contracting parties were cognizant of the doctrine and did not understand Article 28(2) as silently incorporating, or acquiescing in, its application.
 
 
 21
 It is even more difficult to construe Article 28(2) as silently incorporating or acquiescing in the application of forum non conveniens when one considers the historical context in which the British amendment was offered and, more generally, in which the treaty was drafted and negotiated. The Supreme Court repeatedly has counseled against adopting an interpretation of the Convention that would have been discordant or offensive to the majority of signatories. In Floyd, where the Court held that Article 17 of the Convention does not allow recovery for mental or psychic injuries unaccompanied by physical injury, the Court declined to read into the treaty a claim that "would not have been recognized in many... countries represented at the Warsaw Convention." 499 U.S. at 540, 111 S.Ct. 1489. Similarly, in Zicherman v. Korean Air Lines Co., 516 U.S. 217, 223, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996), the Court refused to construe the Convention as permitting an action for nonpecuniary harm where "[m]any signatory nations ... did not, even many years after the Warsaw Convention, recognize a cause of action for nonpecuniary harm." We will not adopt the construction that "would be controversial for most signatory countries." Floyd, 499 U.S. at 552, 111 S.Ct. 1489.
 
 
 22
 Following these rules of construction, we do not infer from the treaty's incorporation of local procedural law that the drafters acquiesced in the application of forum non conveniens, a concept that was (and is) both alien to and unwelcome by the majority of the contracting parties. Forum non conveniens, which permits a court having jurisdiction to decline it, is a feature of the common law. "[T]he Convention," however, "was drafted by civil law jurists, to whom forum non conveniens was an alien concept." In re Air Crash Off Long Island, 65 F.Supp.2d at 214; see also Ronald A. Brand, Comparative Forum Non Conveniens and the Hague Convention on Jurisdiction and Judgments, 37 Tex. Int'l L.J. 467, 468 (2002) ("The doctrine of forum non conveniens generally is unknown in legal systems following the continental civil law model."); James L. Baudino, Comment, Venue Issues Against Negligent Carriers — International and Domestic Travel: The Plaintiff's Choice?, 62 J. Air L. & Com. 163, 192-95 (1996) (surveying civil and common law countries' current practices regarding discretionary jurisdiction).
 
 
 23
 In this historical light, it is unreasonable to infer that the "continental jurists," Floyd, 499 U.S. at 536, 111 S.Ct. 1489, would have succumbed to the British, common law point of view. The more reasonable inference is that the delegates, if they had intended to permit the application of forum non conveniens, would have done so explicitly. Paraphrasing the Supreme Court's statement in Floyd: "Because such a remedy was unknown in many, if not most, jurisdictions in 1929, the drafters most likely would have felt compelled to make an unequivocal reference to [forum non conveniens] if they had specifically intended to allow such [a procedure]." Floyd, 499 U.S. at 545, 111 S.Ct. 1489; see also Milor, [1996] Q.B. at 708("[It] would be surprising if the high contracting parties had preserved to that small minority of countries which applied the doctrine of forum non conveniens a power to affect the choice of the forum in which a dispute should be tried by a process unknown to the majority of the parties.").[13]
 
 D. Postratification Understanding
 
 24
 Plaintiffs contend that more recent history supports the view that the language in Article 28(2), standing alone, does not permit forum non conveniens. In 1999, delegates gathered in Montreal to draft a treaty, commonly known as the Montreal Convention, to replace the Warsaw Convention.[14] Article 33 of the new treaty is similar to Article 28 of the old one.[15] It specifies a set of forums in which jurisdiction is proper and assigns to the plaintiff the choice of forum. Article 33(4), like Article 28(2), incorporates the procedural law of the forum state. In support of their contention, plaintiffs cite the following secondary account of the proceedings by one of the participants:
 
 
 25
 Attempts were made by delegates from common law states to introduce language which would permit the application of the doctrine of forum non conveniens by courts in which proceedings were commenced. Considerable objections were made by delegates from various civil law jurisdictions, who complained that the doctrine was unknown in their jurisdictions and ought not to be imposed upon them by international treaty. The U.S. delegation asserted confidently that forum non conveniens motions would be appropriate in treaty cases notwithstanding the absence of substantial case law demonstrating successful applications in that jurisdiction, and the absence of any provision in the final text of the Convention shows that the civil law jurisdiction delegates prevailed on this issue.
 
 
 26
 Sean Gates, The Montreal Convention of 1999: A Report on the Conference and on What the Convention Means for Air Carriers and Their Insurers, Aviation Q. 186, 189 (1999).[16]
 
 
 27
 The official minutes of the Montreal Convention tell a less conclusive story, however. The United States offered an amendment that would have made explicit a country's right to apply forum non conveniens, provided that the country's procedural rules allowed the doctrine. The United States' proposal would have amended the draft of Article 33(4) to read: "Questions of procedure shall be governed by the law of the Court seised of the case, including the doctrine of forum non conveniens or other similar doctrines." 1 International Civil Aviation Organization, International Conference on Air Law, Montreal 10-28 May 1999, at 159 (2001) (Minutes) (proposed addition in italics); see also id. at 179-80. Notwithstanding the United States' proposal, the final version of the Montreal Convention did not include the proposed language.
 
 
 28
 The drafting history, however, does not establish conclusively that the delegates understood the United States' proposal as a change to the Warsaw regime. Nor does it suggest that the absence of the United States' proposal dealt a blow to forum non conveniens. On the contrary, the drafting history of the Montreal treaty reflects a lack of a shared understanding on the issue that occupies us here: whether the Warsaw Convention language, standing alone, permits or precludes application of forum non conveniens. Every side of this issue found a voice at the Montreal conference. For instance, the United States delegate at one point expressed his opinion "that the doctrine of forum non conveniens would be applied ... in his country whether the [treaty] prescribed that or not." Id. at 159. The British delegate, by contrast, voiced the view that the Warsaw Convention entitled a plaintiff to an absolute choice among four forums, a choice that could not be undermined by forum non conveniens. Id. at 162. The drafting history lacks any conclusive statement by the remaining delegates accepting or rejecting either of these positions. In sum, although forum non conveniens was discussed at length in Montreal, the drafting history does not paint a coherent picture of the parties' understanding of the Warsaw Convention.[17]
 
 
 29
 The history of other international agreements, however, supports the conclusion that the Warsaw Convention's silence on forum non conveniens does not permit that doctrine's application. For instance, the Brussels Convention, which governs enforcement of judgments among European Union countries, was first agreed to in 1968, when only civil law nations were members of the Union.[18] As drafted, the treaty contained no explicit forum non conveniens doctrine and was construed as barring the doctrine's application. Alan Reed, To Be or Not to Be: The Forum Non Conveniens Performance Acted Out on Anglo-American Courtroom Stages, 29 Ga. J. Int'l & Comp. L. 31, 84-85, 106-12 (2000). When the United Kingdom and Ireland joined the European Economic Community in 1979, they tried to negotiate the introduction of a forum non conveniens clause in the Convention, but their efforts were rebuffed. Martine Stuckelberg, Lis Pendens and Forum Non Conveniens at the Hague Conference, 26 Brook. J. Int'l L. 949, 962-63 (2001).
 
 
 30
 Moreover, when a multilateral treaty has meant to allow application of the doctrine, the treaty has said so explicitly. In this respect, the recent negotiating history of the Hague Conference on Private International Law is instructive. The unfinished task of the Hague Conference is the formulation of an international convention on jurisdiction and enforcement of foreign judgments in civil and commercial matters. The participants, including the United States, vigorously debated the availability of forum non conveniens. See Fritz Blumer, Jurisdiction and Recognition in Transatlantic Patent Litigation, 9 Tex. Intell. Prop. L.J. 329, 392-93 (2001). This debate culminated in a compromise expressly allowing "suspension of a case, in exceptional circumstances, if the court seised is clearly inappropriate to decide the case and if a court of another State has jurisdiction and is clearly more appropriate to resolve the dispute." Stuckelberg, supra, 26 Brook. J. Int'l L. at 971. The draft treaty therefore adopts a version of the doctrine of forum non conveniens that balances common law countries' interests against those of civil law countries. The explicit incorporation of a compromise version of forum non conveniens in the draft Hague treaty supports the conclusion that forum non conveniens was not silently incorporated in the Warsaw Convention. Cf. Floyd, 499 U.S. at 545, 111 S.Ct. 1489(reasoning that the Warsaw Convention signatories did not intend to permit recovery for purely psychic injuries where a later international transport treaty included an explicit reference to mental injury that had not been included in the Warsaw treaty).
 
 II.
 
 31
 The only other circuit to have addressed the issue presented in these appeals is the Fifth Circuit, which held "that article 28(1) of the Warsaw Convention does not prevent a district court from considering and applying the doctrine of forum non conveniens." In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1982, 821 F.2d 1147, 1162(5th Cir.1987) (en banc).[19] The persuasiveness of the Fifth Circuit's decision is limited in several respects. The decision did not consider the purposes, drafting history and postratification understanding of the parties, all of which are pertinent tools of construction articulated by the Supreme Court in decisions postdating the Fifth Circuit's analysis. Moreover, the Fifth Circuit in 1987 did not have the benefit of the more recent Milor decision.
 
 
 32
 In any event, we are not persuaded by the court's reasoning. Observing that, under the plaintiffs' construction, "American courts could become the forums for litigation that has little or no relationship with this country," the court found it hard to "believe that the United States through adherence to the Convention has meant to forfeit such a valuable procedural tool as the doctrine of forum non conveniens." Id. We respectfully disagree. There are many possible reasons the United States would have chosen to ratify even knowing that the doctrine of forum non conveniens would not be available in actions brought under the treaty.[20]
 
 
 33
 At the time of the drafting and ratification of the Convention, the forum non conveniens doctrine was not the "valuable procedural tool" that it might be considered today. The doctrine traces its origins to eighteenth century Scottish law, Am. Dredging Co., 510 U.S. at 449, 114 S.Ct. 981, but in 1929 the doctrine was only beginning to take hold in the United States. United States courts applied the doctrine sparingly, "as a nameless principle of law through which a court could decline to exercise jurisdiction, particularly in maritime cases between a foreign plaintiff and foreign defendant." Michael T. Manzi, Comment, Dow Chemical Company v. Castro Alfaro: The Demise of Forum Non Conveniens in Texas and One Less Barrier to International Tort Litigation, 14 Fordham Int'l L.J. 819, 823 (1990/1991). The Supreme Court first approved the principle of a court's discretionary power to decline jurisdiction in 1929. See Douglas v. New York, New Haven & Hartford R.R. Co., 279 U.S. 377, 49 S.Ct. 355, 73 L.Ed. 747 (1929) (holding that a state court did not violate the Privileges and Immunities Clause of the Constitution by declining jurisdiction in an action between citizens of another state).[21] Even after that date, "state and federal courts did not begin to employ forum non conveniens widely except in maritime cases, and cases involving the internal affairs of a corporation." Manzi, supra, 14 Fordham Int'l L.J. at 823. It was not until 1932, in Canada Malting Co. v. Paterson S.S., Ltd., 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837 (1932), that the Supreme Court held that the exercise of discretionary powers by United States courts in declining jurisdiction should not be restricted to admiralty cases. Only in 1941, in Baltimore & Ohio R. Co. v. Kepner, 314 U.S. 44, 55-56, 62 S.Ct. 6, 86 L.Ed. 28 (1941) (Frankfurter, J., dissenting), did one justice of the Court describe the doctrine as "firmly imbedded in our law." Not until Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), did "the forum non conveniens doctrine finally enjoy[ ] express acknowledgment." Reus, supra, 16 Loy. L.A. Int'l & Comp. L.J. at 461; see also Stuckelberg, supra, 26 Brook. J. Int'l L. at 955("Until the middle of the twentieth century, the exception was very limited and a dismissal only could be ordered if the forum was `oppressive or vexatious' to the defendant."). "[T]he doctrine of forum non conveniens was not fully crystallized" until the 1947 Gilbert decision. Piper Aircraft, 454 U.S. at 248, 102 S.Ct. 252.
 
 
 34
 In sum, that the doctrine of forum non conveniens might be characterized as a valuable procedural tool today does not mean that it was so in 1929, when the participating nations applied the finishing touches to the treaty, or even in 1934, when the United States ratified it. Thus, we have no difficulty imagining that the United States would have sacrificed application of this modestly important procedural tool to obtain the benefits of the Convention. As Sir Alfred Dennis, the head of the British delegation, remarked, "As regards the British Government, the sole reason which it has for entering into this Convention is the desire to achieve uniformity.... The draft of the Convention is contrary, on several points, to our laws and to our customs, but we have decided to make sacrifices to obtain this uniformity." Minutes at 35-36. Even in the United States, we have never considered the doctrine to be of such importance that it should override all other concerns. See, e.g., United States v. Nat'l City Lines, 334 U.S. 573, 596-97, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948) (holding that forum non conveniens is not available in actions brought under the Clayton Act).
 
 III.
 
 35
 Although the text of the Warsaw Convention is ambiguous, the purposes and drafting history of the treaty, as well as evidence of the parties' postratification understanding and treatment of the issue in other treaties and by other courts, persuade us that the contracting parties did not intend to permit the plaintiff's choice of national forum to be negated by the doctrine of forum non conveniens. We therefore hold that Article 28(1) of the Warsaw Convention precludes a federal court from dismissing an action on the ground of forum non conveniens.
 
 
 36
 The reach of our decision is limited to the application of forum non conveniens to dismiss a case in favor of a forum in another country. Our decision does not affect whether a particular United States court has subject matter jurisdiction over a case; nor does it alter a federal court's power to transfer a case within the United States pursuant to 28 U.S.C. § 1404(a). See In re Air Crash Disaster Near New Orleans, 821 F.2d at 1161 n. 21 (explaining that Article 28(1) relates only to whether jurisdiction in the international or treaty sense is established and does not determine the power of a particular United States court, under federal statutes and practice, to hear a Warsaw Convention case or affect whether venue is proper and convenient in a particular federal court); Smith v. Canadian Pac. Airways, Ltd., 452 F.2d 798, 800(2d Cir.1971) (same).
 
 CONCLUSION
 
 37
 We reverse the orders of the district court dismissing these actions on the basis of forum non conveniens. We therefore do not reach the remaining issues raised in these appeals.[22]
 
 
 38
 REVERSED AND REMANDED.
 
 
 
 Notes:
 
 
 *
 The Honorable Donald W. Molloy, Chief Judge, United States District Court for the District of Montana, sitting by designation
 
 
 [1]
 We have no occasion to decide whether state courts may apply their own doctrines of forum non conveniens to actions arising under the Warsaw Convention
 
 
 [2]
 The district court had before it 18 related cases, each of which it dismissed on the ground of forum non conveniens. It dismissed 14 of them on January 7, 2000 and the remaining four on December 19, 2000. All 18 cases are consolidated for the purposes of this appeal
 
 
 [3]
 Citations in this opinion are to the official United States translation of the ConventionSee 49 Stat. 3014-23. Where relevant, we also provide the Convention's governing French text. See 49 Stat. 3000-09; Saks, 470 U.S. at 397, 105 S.Ct. 1338. The French text of Article 28 reads:
 (1) L'action en responsabilité devra êtra porteé, au choix du demandeur, dans le territoire d'une des Hautes Parties Contractantes, soit devant le tribunal du domicile du transporteur, due siège principal de son exploitation ou du lieu o ù il posséde un éstablissement par le soin duquel le contrat aété conclu, soit devant le tribunal du lieu de destination.
 (2) La procédure sera réglée par la loi du tribunal saisi.
 
 
 [49]
 Stat. at 3007
 
 
 [4]
 Were we construing an act of Congress, our analysis of the same text would be different because we presume that federal statutes' venue provisions do not preempt forum non conveniens unless Congress' contrary intent is manifestly clearSee Creative Tech., Ltd. v. Aztech System Pte, Ltd., 61 F.3d 696, 700 (9th Cir.1995). This rule of construction, however, does not control in the case of international treaties. See Tseng, 525 U.S. at 175, 119 S.Ct. 662 ("Our home-centered preemption analysis ... should not be applied, mechanically, in construing our international obligations."). The Warsaw Convention is not an act of Congress, which acts with a backdrop favorable to forum non conveniens. Rather, the Convention was "drafted in French by continental jurists," Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 536, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991), to whom the forum non conveniens doctrine was contrary to their national laws. See Section I.C, infra. We therefore analyze the text neutrally, without a thumb on the scale in favor of forum non conveniens.
 
 
 [5]
 The Milor decision, as an "opinion[] of our sister signator[y]," is "entitled to considerable weight."Saks, 470 U.S. at 404, 105 S.Ct. 1338.
 
 
 [6]
 Article 29(1) states:
 (1) The right to damages shall be extinguished if an action is not brought within 2 years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped.
 (2) The method of calculating the period of limitation shall be determined by the law of the court to which the case is submitted.
 
 
 [49]
 Stat. at 3021. The French text states:
 (1) L'action en responsibilité devra êtra intentée, sous piene de déchéancs, dans le délai de deux ans à compter de l'arrivée à destination ou du jour où l'aéronef aurait dû arriver, ou de l'arrêt du transport.
 (2) Le mode du calcul du délai est déterminé par la loi du tribunal saisi.
 
 
 [49]
 Stat. at 3007
 
 
 [7]
 See Cassell's French and English Dictionary 251 (J.H. Douglas, D. Girard & W. Thompson eds.1986) (defining porter as "to carry, to bear, to support; to endure; to bring; to take"); The Oxford-Hachette French Dictionary 627 (M. Correard & V. Grundy eds. 1994) (defining porter plainte as "to lodge a complaint"); Cassell's French and English Dictionary, supra, at 192(defining intenter une action or un procés à or contre quelu'un as "to enter or bring an action against someone"); The Oxford-Hachette French Dictionary, supra, at 438 (defining intenter un procés á as "to sue" and intenter un action contre as "to bring an action against").
 
 
 [8]
 Note that, whereas only the French text of the Warsaw Convention is authentic, the French and English texts of the Montreal Convention are equally authentic. Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on 28 May 1999, S. Treaty Doc. No. 106-45, text following art. 57
 
 
 [9]
 The Supreme Court's decision inAmerican Dredging is not to the contrary. There, the Court held that a state's application of forum non conveniens did not "`interfere[] with the proper harmony and uniformity' of maritime law." 510 U.S. at 451, 114 S.Ct. 981. Because maritime law's requirement of uniformity was intended to reach only those matters that "bear upon the substantive right to recover," forum non conveniens was not inconsistent with that requirement. Id. at 454, 114 S.Ct. 981. Here, by contrast, the existence of Article 28(1) manifests the drafters' intent to reach matters of jurisdiction and to require uniformity in the rules governing the plaintiff's choice of forum. See Andreas F. Lowenfeld & Allan I. Mendelsohn, The United States and the Warsaw Convention, 80 Harv. L.Rev. 497, 498-99 & n. 8 (1967) (describing Article 28(1)'s jurisdictional rules as an element of the treaty's uniformity).
 
 
 [10]
 The United States did not participate in the work of the drafting committee and sent only an advisor to the Warsaw ConferenceSee Lowenfeld & Mendelsohn, supra, 80 Harv. L. Rev. at 502; Minutes of the Second International Conference on Private Aeronautical Law 10 (Oct. 4-12, 1929) (R. Horner & D. Legrez trans., 1975) (hereinafter "Minutes"). This fact does not, however, lessen the significance of the drafting history. See, e.g., Chan, 490 U.S. at 137, 109 S.Ct. 1676 (Brennan, J., concurring).
 
 
 [11]
 The British proposal would have amended Article 26 of the preliminary draft. By the time of the final draft, Article 26 had been renumbered as Article 28
 
 
 [12]
 Although not using the term "forum non conveniens," the proposal accurately reflected the doctrine as it existed in England at the timeSee, e.g., Logan v. Bank of Scotland, [1906] 1 K.B. 141, 150 (reasoning that actions that involve "such vexation and oppression that the defendant who objects to the exercise of the jurisdiction would be subjected to such injustice that he ought not to be sued in the Court in which the action is brought"); see also Ronald A. Brand, Comparative Forum Non Conveniens and the Hague Convention on Jurisdiction and Judgments, 37 Tex. Int'l L.J. 467, 470-71 (2002) (describing development of forum non conveniens in England); Alexander Reus, Judicial Discretion: A Comparative View of the Doctrine of Forum Non Conveniens in the United States, the United Kingdom, and Germany, 16 Loy. L.A. Int'l & Comp. L.J. 455, 477-79 (1994) (same). For a discussion of the development of the doctrine within the United States, see Section II, infra.
 
 
 [13]
 We also cannot assume that the drafters would have understood the doctrine of forum non conveniens to be a "[q]uestion[] of procedure," as that term was used in Article 28(2). Half a century after the Convention was drafted, it remained an unsettled question in the United States whether forum non conveniens constituted a procedural rule within the meaning ofErie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 248 n. 13, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (declining to reach "the Erie question"); cf. Am. Dredging Co., 510 U.S. at 453, 114 S.Ct. 981 (describing forum non conveniens as procedural, although not in the context of Erie analysis). 14291
 
 
 [14]
 The official name of the new treaty,see Section I.A., supra, is the Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on 28 May 1999, S. Treaty Doc. No. 106-45. The treaty was completed and signed in 1999, but will not take effect (and replace the Warsaw Convention) until it has been ratified by the requisite number of countries.
 
 
 [15]
 Article 33 provides:
 
 
 [1]
 An action for damages must be brought, at the option of the plaintiff, in the territory of one of the States Parties, either before the court of the domicile of the carrier or of its principal place of business, or where it has a place of business through which the contract has been made or before the court at the place of destination
 
 
 [2]
 In respect of damage resulting from the death or injury of a passenger, an action may be brought before one of the courts mentioned in paragraph 1 of this Article, or in the territory of a State Party in which at the time of the accident the passenger has his or her principal and permanent residence and to or from which the carrier operates services for the carriage of passengers by air, either on its own aircraft, or on another carrier's aircraft pursuant to a commercial agreement, and in which that carrier conducts its business of carriage of passengers by air from premises leased or owned by the carrier itself or by another carrier with which it has a commercial agreement
 
 
 [3]
 For the purposes of paragraph 2,
 (a) "commercial agreement" means an agreement, other than an agency agreement, made between carriers and relating to the provision of their joint services for carriage of passengers by air;
 (b) "principal and permanent residence" means the one fixed and permanent abode of the passenger at the time of the accident. The nationality of the passenger shall not be the determining factor in this regard.
 
 
 [4]
 Questions of procedure shall be governed by the law of the court seised of the case
 
 
 [16]
 Gates, legal advisor to the international Union of Aviation Insurers, participated as an observer in the drafting of the Montreal ConventionSee 1 International Civil Aviation Organization, International Conference on Air Law, Montreal 10-28 May 1999, at 28, 161 (2001) (Minutes).
 
 
 [17]
 We offer no opinion as to whether the text and drafting history of the Montreal Convention demonstrate whether forum non conveniens would be available in an action brought under that as-yet-unratified treaty
 
 
 [18]
 The formal name of the treaty is the Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters, Sept. 27, 1968
 
 
 [19]
 As noted, one district court has agreed with the Fifth CircuitSee In re Air Crash Off Long Island New York, on July 17, 1996, 65 F.Supp.2d 207, 214 (S.D.N.Y.1999). The doctrine also has been applied in other federal cases in which the issue of the Warsaw Convention's preemptive effect was not discussed. See, e.g., Coyle v. P.T. Garuda Indonesia, 180 F.Supp.2d. 1160, 1170 (D.Or.2001); Robert Bosch Corp. v. Air France, 712 F.Supp. 688, 691 (N.D.Ill.1989); Intel Corp. v. Malaysian Airline Sys., 652 F.Supp. 1101, 1102 (N.D.Cal. 1987).
 
 
 [20]
 No legislative history exists regarding the United States' ratificationSee Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 273, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) (Stevens, J., dissenting) ("The President submitted the Convention to the Senate in 1934, which gave its advice and consent by voice vote without committee hearings, committee reports, or floor debate.") (citing 78 Cong. Rec. 11582 (1934)).
 
 
 [21]
 Commentator Paxton Blair first dubbed the American courts' application of discretionary dismissal "forum non conveniens," adopting the Scottish term, in 1929See Paxton Blair, The Doctrine of Forum Non Conveniens in Anglo-American Law, 29 Colum. L. Rev. 1, 21 (1929).
 
 
 [22]
 Plaintiffs argue that the district court erred in the choice of law analysis included in its decision to dismiss on the basis of forum non conveniens, an issue mooted by our reversal on other grounds. To the extent choice of law issues remain in the case, nothing we decide today should be interpreted as a validation of the district court's choice of law analysis as articulated in the forum non conveniens context